**IT IS ORDERED as set forth below:**

**Date: February 5, 2024**

_____

**Sage M. Sigler**
**U.S. Bankruptcy Court Judge**

_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| In re: | CASE NUMBER |
|---|---|
| **DAVID GEORGE DACOSTA**, | **22-59912-SMS** |
| Debtor. | CHAPTER 13 |

## ORDER IMPOSING SANCTIONS

At a prior hearing, Debtor described a fee dispute and expressed dissatisfaction with his counsel in this case. The Court ordered Debtor's counsel to appear and explain why he should not be sanctioned, including the reduction or disgorgement of his fees. The Court expected counsel to respond by presenting relevant evidence that his fees were appropriate and earned through adequate representation. Instead, counsel submitted no exhibits, appeared without an attorney-client agreement or records of any kind, and spent nearly the entire hearing on a misguided mission to disparage his client. In representing his client in this case—and himself in defense of his fees—counsel failed to properly serve his client or follow the rules of this Court or the Georgia Rules of

Professional Conduct. Accordingly, for the reasons discussed below, the Court will sanction counsel in the amount of $7,700. The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052.[1]

I. **BACKGROUND**

　　a. *Procedural History*

On December 5, 2022 (the "Petition Date"), David George DaCosta ("Debtor") filed a petition under chapter 13 of the Bankruptcy Code (Doc. 1), initiating the above-styled case and stopping a foreclosure sale scheduled on real property located at 565 Peachtree Street NE Unit 907, Atlanta, Georgia 30308 (the "Property"). Along with his petition, Debtor filed schedules, a statement of financial affairs, and a chapter 13 plan (Docs. 1, 2), all of which were executed by Stanley J. Kakol, Jr. ("Counsel") as Debtor's counsel.

Attached to Debtor's petition is the *Disclosure of Compensation of Attorney for Debtor(s)* signed by Counsel (the "Compensation Disclosure," Doc. 1 at 39). In the Compensation Disclosure, Counsel certifies that he agreed to accept $5,200 in exchange for legal services incident to this case, including routine procedural matters related to filing a chapter 13 case and confirming a chapter 13 plan. Among those routine matters are motions to extend or impose the automatic stay and objections to claims necessary to confirm a plan.

This was Debtor's second case pending within one year, so the automatic stay as to Debtor was set to expire on January 4, 2023.[2] *See* 11 U.S.C. § 362(c)(3)(A). Instead of promptly filing a motion to extend the stay as contemplated by § 362(c)(3)(B), or belatedly filing the motion and requesting to shorten the notice period, Counsel filed a *Motion to Impose Stay* on Debtor's behalf

---

[1] Any findings of fact that are more properly construed as conclusions of law shall be so construed, and vice versa.

[2] Debtor disclosed his prior bankruptcy case pending and dismissed within the last year, case number 22-55018, in his petition, which Counsel signed and filed.

on December 16, 2022, and set the motion for hearing on January 10, 2023—after the expiration of the stay. *See* 11 U.S.C. § 362(c)(3)(B) ("the court may extend the stay . . . after notice and a hearing completed before the expiration of the 30-day period [after the Petition Date]"). Counsel styled the motion "to impose" rather than "to extend" the automatic stay because he failed to timely schedule the hearing on the motion.³

After filing a chapter 13 plan with the incorrect case number (Doc. 22), Counsel filed an amended plan on behalf of Debtor on March 13, 2023, that the Court confirmed on May 2, 2023 (the "Confirmed Plan," Docs. 23, 26). Pursuant to the Confirmed Plan, Debtor would continue to pay his postpetition mortgage payments on the Property directly and would also pay $986 per month to K. Edward Safir, Standing Chapter 13 Trustee (the "Chapter 13 Trustee"), for a 36-month applicable commitment period. From these funds, Debtor would: (i) repay a $40,292 arrearage on the Property (the "Arrears") at $100 per month, increasing to $912 per month in September 2023; (ii) pay Counsel $4,200 in unpaid legal fees and expenses at $762 per month until paid in full; and (iii) pay general unsecured creditors 100% of their claims (roughly $4,000).

On February 13, 2023, U.S. Bank Trust National Association, solely as trustee of the Truman 2021 SC9 Title Trust ("Truman") filed proof of claim no. 4 (the "Truman Claim") on the Court's Claims Register asserting a total claim in the amount of $196,168.29 as of the Petition Date, including $41,803.58 in arrears, all fully secured by the Property. In the Truman Claim, Truman affirmed that their total claim includes interest or other charges, triggering the required attachment of a "statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A)." No such statement was attached to the Truman Claim. Nor was

---

³ A debtor's burden of proof is materially higher for a motion to impose than a motion to extend, but no creditor or party in interest opposed the motion.

there a complete attachment to the Truman Claim as required by Bankruptcy Rule 3001(c)(2)(C).[4] Counsel did not object to the Truman Claim on Debtor's behalf.

On August 14, 2023, the Chapter 13 Trustee filed a motion to dismiss this case for Debtor's failure to maintain payments under his Confirmed Plan (Doc. 30). The Chapter 13 Trustee alleged that Debtor was delinquent in the amount of $2,958. By agreement of the parties, the Court denied the motion on September 29, 2023, and ordered that Debtor strictly comply with the terms of his Confirmed Plan in remitting timely payments to the Chapter 13 Trustee for a period of 12 months, with the failure to do so potentially resulting in dismissal of the case (Doc. 37).

On July 26, 2023, Truman sought relief from the automatic stay after Debtor allegedly failed to maintain his postpetition mortgage payments (the "Stay Relief Motion," Doc. 29). Debtor, acting *pro se*, filed a response to the Stay Relief Motion on August 26, 2023 (Doc. 31). Truman initially set a hearing on its Stay Relief Motion for August 22, 2023, but continued the hearing to September 12, 2023, then to September 26, 2023, and then to October 17, 2023. At the October 17, 2023 hearing (the "October Hearing"), Debtor personally appeared before the Court in opposition to the Stay Relief Motion and sought sanctions against Counsel for issues related to Counsel's representation and fee arrangement.

Although Counsel was present to hear Debtor's allegations levied against him, to afford Counsel an opportunity to understand Debtor's grievances and respond accordingly, the Court entered the *Order to Show Cause and Notice of Hearing* (the "Show Cause Order," Doc. 40) on October 20, 2023. The Show Cause Order directed Counsel to appear before the Court on December 5, 2023 (the "Show Cause Hearing"), and explain why he should not be sanctioned for

---

[4] On January 23, 2024, Truman amended its claim. The amended claim now appears to include the itemization and attachment.

the disputes with Debtor over the agreed fee and the scope and quality of Counsel's representation in this case. The Show Cause Order provided notice to Counsel that his fees could be reduced or disgorged if he failed to defend them.[5]

### b. The Show Cause Hearing

The Court scheduled the Show Cause Hearing to coincide with the continued evidentiary hearing on Truman's Stay Relief Motion. A transcript of the hearing was docketed on December 22, 2023 (the "Transcript" or "Trans.," Doc. 58). At Truman's request, the Court continued the hearing on Truman's motion for further evidence. The Court then turned to the subject of the Show Cause Order.

Through questioning, the Court was able to determine that Debtor's grievances with Counsel are: (i) a dispute over the agreed flat fee for legal services; (ii) that Counsel failed to adequately communicate with Debtor, including the purpose of the "down payment" Counsel required Debtor to remit prior to filing this case; and (iii) that Counsel has failed to properly represent Debtor in prosecuting this case including, but not limited to, Counsel's refusal to object to the Truman Claim. Debtor's asserted damages for these grievances include mental and emotional stress, Counsel's fees, and costs incurred related to Truman's Stay Relief Motion.

Notwithstanding, or perhaps because of, Debtor's grievances, Counsel repeatedly disparaged his client throughout the Show Cause Hearing. Even after multiple admonishments from the Court, Counsel continued aggressively attacking Debtor's character and mental health. Counsel's egregious behavior at the Show Cause Hearing, detailed below, warrants sanctions independent of any other events in this case.

---

[5] The Show Cause Order also directed Counsel to submit any exhibits to other parties in interest and to chambers in advance of the hearing. Although Debtor submitted several exhibits prior to the Show Cause Hearing while acting *pro se*, Counsel submitted none.

## II. ANALYSIS

### a. *The Court has the authority to sanction Counsel.*

"Federal courts, including bankruptcy courts, have the inherent power to impose sanctions on parties and lawyers." *In re Evergreen Security, Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009) (quoting *In re Walker*, 532 F.3d 1304, 1309 (11th Cir. 2008)); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S.Ct. 2123, 2132 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").

A bankruptcy court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code under § 105(a), including imposing sanctions against attorneys. *In re Matus*, 303 B.R. 660, 683 (Bankr. N.D. Ga. 2004). *See also In re Jove Eng'g, Inc. v. IRS*, 92 F.3d 1539, 1554 (11th Cir. 1996) ("The plain meaning of § 105(a) encompasses any type of order, whether injunctive, compensative or punitive, as long as it is 'necessary or appropriate to carry out the provisions of' the Bankruptcy Code."). Section 105 empowers courts "to regulate those who appear before it, and what they say and do during that representation." *In re New River Dry Dock, Inc.*, No. 06–13274–BKC–JKO, 2011 WL 4382023, at *2 (Bankr. S.D. Fla. Sept. 20, 2011), *aff'd sub nom. In re Gleason*, No. 11– 62406–CIV, 2012 WL 463924 (S.D. Fla. Feb. 13, 2012), *aff'd*, 492 F. App'x 86 (11th Cir. 2012). "The Court has inherent and statutory authority to control admission to its bar and to discipline attorneys practicing before the Court" independent of the State Bar of Georgia's authority and disciplinary proceedings to sanction its members for misconduct. *Id.* at *3.

In addition, the Bankruptcy Code empowers the Court to disgorge an attorney's compensation to the extent "such compensation exceeds the reasonable value of any such services." 11 U.S.C. § 329(b). *See, e.g., In re Robbins*, No. 07-62006-PWB, 2007 Bankr. LEXIS 4411, at *13 (Bankr. N.D. Ga. Oct. 2, 2007) (disgorging attorney fees where attorney appeared to

have abandoned his client); *Hill v. Greentree Servicing, LLC (In re Hill)*, 572 B.R. 793 (Bankr. N.D. Ga. 2017) (disgorging attorney fees where plan did not satisfy Bankruptcy Code requirements).

### b. *The agreed rate for legal services was $5,200, and Counsel has been paid in full.*

Neither Debtor nor Counsel submitted a copy of their attorney-client agreement as evidence, nor is it otherwise a part of the record in this case.[6] Debtor believed that he would pay Counsel $4,900 for representation in this case inclusive of the $313 filing fee. Trans. 75:20-21; 76:16-17; 79:17-18. To initiate the case, Debtor had to pay Counsel $1,000 up front. Trans. 68:10-16. It was undisputed at the Show Cause Hearing that Debtor's first payment to Counsel was in the amount of $1,313—the exact amount of the $1,000 up front cost plus the $313 filing fee—and Debtor understood that $313 of his first payment would pay the filing fee. *See* Trans. 74:8-10; 78:16.

Counsel stated under penalty of perjury in the Compensation Disclosure that the agreed rate was $5,200 (Doc. 1 at 39). Counsel also testified that the agreed rate provided in the attorney-client agreement was $5,200, Trans. 92:25-93:1, but could not remember whether the attorney-client agreement discloses that the filing fee is separate. Trans. 93:12-14. The Compensation Disclosure states that Debtor paid $1,000 prior to filing, and the Chapter 13 Trustee confirmed that his office had already paid the remaining $4,200 to Counsel. Trans. 67:6-7. Based upon the record,[7] the Court finds that the agreed rate for legal services in this case was $5,200, that this amount did

---

[6] Counsel stated, "I don't have [the attorney-client agreement] with me today because I submitted it as part of [the United States Trustee's] full-blown investigation into this." Trans. 91:8-10. Counsel for the United States Trustee described on the record the attorney-client agreement that he received from Counsel as part of his inquiry into this matter, but because no party submitted evidence on the issue—an exhibit or testimony—the Court was unable to consider such statements as evidence in this determination.

[7] After the Show Cause Hearing, Debtor submitted a purported copy of the attorney-client agreement to chambers. The Court could not consider this submission in its determination, but the document shows a rate of $5,200 for legal services for this case and that court costs are separate.

not include the $313 filing fee, and that Counsel has received payment in full of the entire $5,200.

### c. Counsel misled Debtor about the purpose of the $1,000 down payment.

Counsel required Debtor to pay $1,000 up front to file this case, stating that the purpose of the down payment was to "show the Court good faith that [Debtor] has the money to make this case work." Trans. 84:18-19. Debtor believed that the $1,000 would go to the Chapter 13 Trustee as plan payments. But Counsel kept those funds as payment for his services and disclosed the same on the Compensation Disclosure. Trans. 75:6-12; 112:24-25.

Counsel stated at the Show Cause Hearing that he charged the $1,000 fee "to show the Court good faith and as attorney's fees," Trans. 93:2-3, and that he needed "to have good faith money up front because either zero or very little was paid into [Debtor's] prior case." Trans. 97:6-7. Counsel also testified that the purpose of those funds was set out in the attorney-client agreement, but he did not produce the agreement. Despite ample time to prepare for an evidentiary hearing at which he knew the $1,000 payment was at issue, Counsel could not provide further clarity to the Court regarding the purpose of the $1,000 payment. It is therefore not credible that he made that purpose clear to Debtor at any point.

The Court finds Counsel's vague explanation for requiring the $1,000 upfront payment misleading and disingenuous. To this Court's knowledge, Counsel has never presented evidence of prepaid attorney's fees as evidence of good faith in this or any other bankruptcy case before this Court. Although the Court routinely determines whether a debtor filed a bankruptcy case in good faith, the Court cannot recall an attorney ever submitting evidence or arguing to the Court that a debtor's good faith is shown by their up-front payment for legal services. It is not violative of any rule of which the Court is aware—and it is indeed understandable—that an attorney may choose

to require a debtor with prior failed cases to pay some attorney's fees up front.[8] But to suggest to a debtor that a down payment for attorney's fees is somehow expected by the Court, as opposed to the attorney, for the success of their case is grossly misleading.

### d. Counsel failed to adequately communicate with Debtor.

1. Counsel's communications with Debtor were not sufficient.

Debtor met with Counsel once (via telephone) prior to filing this case. Trans. 112:22-23. Debtor contacted Counsel's office in January, February, and March 2023 about the nature of his $1,000 up-front payment and because he believed that creditors were violating the automatic stay, but Debtor was not able to speak with Counsel directly. Instead, Debtor spoke only with Counsel's staff, who told Debtor that Counsel would return his calls. Trans. 113:1-4. Counsel did not return those calls. Debtor obviously did not understand that the $1,000 was going directly to pay Counsel's fees when he repeatedly attempted to contact Counsel. Nevertheless, Counsel did nothing to resolve the misunderstanding—or speak with his client at all—before the October Hearing over ten months later. Trans. 114:4-6.

Counsel's reason for not returning his client's calls was simple: "*I don't have to return calls from my clients*." Trans. 88:12-15 (emphasis added). Counsel explained that he trained his staff, with whom he meets regularly, to communicate with clients on his behalf. Trans. 88:15-16. Whether Counsel or Counsel's staff ever communicated to Debtor that he would not be hearing from Counsel directly is not clear, but Debtor apparently received the message. With no response from Counsel and unsure what to do, Debtor stopped making his postpetition mortgage payments and plan payments in April 2023. Trans. 70:19-21. Truman's Stay Relief Motion and the Chapter

---

[8] Attorneys for debtors in chapter 13 bankruptcy cases often receive payment of their fees through a chapter 13 plan, but if their client does not make plan payments, the attorney receives nothing. In those cases, attorneys receive only any down payment they required as total compensation, regardless of the agreed rate and actual services provided. Nevertheless, attorneys must be forthright, honest, and clear with clients about the purpose of any down payment.

13 Trustee's motion to dismiss followed (together, the "Motions").

Counsel's office informed Debtor of the Motions in August 2023 by leaving several voicemails and speaking with Debtor once via telephone. Trans. 114:21-23. Counsel did not contact Debtor directly, again relying on his staff to relay the pertinent information to Debtor. Trans. 104:6-10. Although Debtor contested the facts underlying the Motions and disagreed with Counsel's staff on how to resolve them, Counsel refused to contact Debtor directly. Trans. 104:17-25.

At the October Hearing on the Motions, Debtor appeared *pro se* and voiced concerns to the Court about, among other things, his difficulty communicating with Counsel. Following the October Hearing, Counsel had a series of phone conversations with Debtor that led to an in-person meeting at Counsel's office. Trans. 105:1-5. At the meeting, Debtor spoke with Counsel about fees Truman assessed to his account and possible automatic stay violations. Counsel dismissed Debtor's concerns about the Truman Claim, asserting that because Debtor could not produce evidence to support his allegations, Counsel was justified in not returning his calls. Trans. 88:24-89:10. Accounts of the meeting vary, but Counsel attempted to explain why Debtor was required to pay $1,000 by showing Debtor that he had not made any plan payments in his prior case. Trans. 82:9-12. Debtor, already mistrusting Counsel after not receiving return calls for months, thought that Counsel was showing him an unrelated document, and left the meeting without understanding the purpose of the $1,000 payment. Trans. 70:1-2. Counsel apparently tried to contact Debtor again after he left, but Debtor did not return his calls. Trans. 105:9-13. Those were the last communications between Counsel and Debtor before the Show Cause Hearing.

2. Counsel's communication failures are sanctionable.

Counsel spoke with Debtor once before filing this case and then not again for ten months. During that time, Debtor's concerns—the purpose of his initial $1,000 payment, the status of his

plan payments, the Arrears he was to pay through his Confirmed Plan, and the communications he received from creditors postpetition—were all integral to Counsel's representation of Debtor in this case. Counsel does not recall whether he ever spoke directly with his staff about the Stay Relief Motion, but left Debtor to communicate only with his staff. Trans. 102:7-11. Although explanations by Counsel's staff failed to appease Debtor, Counsel made no effort to communicate with his client directly. When Debtor stopped making payments and the Motions followed, Counsel left his staff—who are not lawyers—to advise Debtor. When Debtor disagreed with Counsel's staff over how to resolve the Motions, Counsel ignored him. When Debtor personally appeared before the Court at the October Hearing, Counsel finally agreed to meet with him in person and discuss the issues. But even then, despite the Truman Claim's failure to include the required itemization of fees, Counsel refused to entertain the notion that fees assessed against Debtor's mortgage account were erroneous unless Debtor, who is not an attorney, could present "evidence."[9]

Counsel is a member of the State Bar of Georgia and is admitted to practice before the District Court and the Bankruptcy Court for the Northern District of Georgia. The District Court's LR 83.1C, made applicable to this proceeding by BLR 9010-3, provides that "[a]ll lawyers practicing before this Court are governed by and must comply with . . . the Georgia Rules of Professional Conduct." In failing to respond to Debtor's inquiries and in opting to ignore Debtor rather than either attempting to explain matters or simply withdrawing from representing Debtor, Counsel failed to reasonably communicate with Debtor in violation of Professional Rule 1.4.[10]

---

[9] Counsel stated: "I'm not going to file a bogus objection to a claim when I have no idea whether the client is right or not. I want to see some evidence." Trans. 89:13-15. When questioned by the Court about the lack of itemization of fees in the Truman Claim, Counsel stated: "I've got to see something besides something to tell me that that does not look like a valid claim, and [Debtor] wouldn't provide it," Trans. 89:21-23, and "[the Truman Claim] looks good enough to me on the initial review." Trans. 90:1-2.

[10] Rule 1.4 provides:

Moreover, Counsel failed to comply with this Court's General Order 42-2020, which applies to all attorneys admitted to practice before this Court. Section 8.0 of General Order 42-2020 states:

> Before filing a Chapter 13 petition on behalf of a Debtor, the attorney for the Debtor must provide the Debtor a copy of the statement of Rights and Responsibilities attached as Exhibit A [(the "Rights and Responsibilities Statement")] and shall certify same in the 2016(b) Statement. Failure of an attorney to perform all of the attorney's duties set forth in the statement of Rights and Responsibilities may result in the reduction or disgorgement of fees, expenses, and costs in such amount as the Court concludes is appropriate.

The Rights and Responsibilities Statement provides that after a case is filed, the attorney shall:

> 10. Promptly respond to Debtor's questions through the term of the plan.
>
> …
>
> 13. On or before 60 days after the general bar date, certify the attorney has reviewed claims with Debtor, prepared, filed and served objections to improper or invalid claims and filed claims within 30 days after the bar date for creditors who fail to file claims when such failure will adversely affect Debtor's case or its successful completion and discharge or such failure will adversely affect Debtor after case completion and discharge.
> 14. Timely confer with Debtor and respond to any motion to dismiss the case, such as for payment default, or unfeasibility, and to motions to increase percentage payment to unsecured creditors.
> 15. Timely confer with Debtor and respond to motions for relief from stay.
>
> …

---

(a) A lawyer shall:

    (1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(l), is required by these rules;

    (2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

    (3) keep the client reasonably informed about the status of the matter;

    (4) promptly comply with reasonable requests for information; and

    (5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Georgia Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

       17. Provide any other legal services necessary for the administration of the case.

Exhibit A, General Order 42-2020.

The record shows that Counsel violated both Professional Rule 1.4(a) and this Court's General Order 42-2020 by failing to: (i) respond to Debtor's questions; (ii) review filed claims with Debtor and certify his review;[11] (iii) confer with Debtor about the Chapter 13 Trustee's motion to dismiss beyond directing his staff to tell Debtor how to resolve it; (iv) confer with Debtor about Truman's Stay Relief Motion beyond his staff telling Debtor how to resolve it; and (v) adequately inquire about Debtor's allegations against Truman. Additionally, Counsel violated Professional Rules 1.2,[12] 1.3,[13] and 1.4(b) by limiting the scope of his representation with respect to the Truman Claim without Debtor's informed consent and by willfully disregarding the dispute he knew to exist.

      ***e. Counsel failed to adequately represent Debtor.***

A cursory review of the record in this case may support Counsel's assertions that he "did a darn good job on this case," and "got [Debtor] a good result." Trans. 93:17-23. Counsel appears to have accomplished many of the goals that Debtor hired him to pursue, such as avoiding

---

[11] *See* case docket, *generally*.

[12] Rule 1.2 provides:

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the scope and objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter…

…

(c) A lawyer may limit the scope and objectives of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.

…

[13] Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client. Reasonable diligence as used in this rule means that a lawyer shall not without just cause to the detriment of the client in effect willfully abandon or willfully disregard a legal matter entrusted to the lawyer."

foreclosure of the Property, protecting the Property with the automatic stay, and confirming a chapter 13 plan.

But on closer review, Counsel's representation in this case is problematic. Counsel appears to have strongarmed Debtor into the Confirmed Plan, which includes the repayment of an arrearage amount that Debtor has consistently disputed, without fully informing Debtor of the consequences of confirming such a plan. Additionally, Counsel allowed the automatic stay to lapse with respect to Debtor by failing to timely schedule a hearing to extend the stay, causing Debtor's burden of proof to increase significantly. Counsel also did not certify that he reviewed the claims filed in this case as required. And even when Debtor raised the issue of the Truman Claim, which was plainly objectionable due to its failure to include the fee itemization and claim attachment required by Bankruptcy Rule 3001(c), Counsel refused to act because Debtor did not provide "evidence."

Counsel's communication failures likewise bear on the quality of representation he provided in this case. While Debtor was confused about the purpose of his $1,000 up-front payment and believed that Truman was violating the automatic stay, Counsel refused to speak to his client directly. When Counsel felt that he could not communicate effectively with his client, he cut off all communication rather than seeking to withdraw as counsel.[14] And when Debtor questioned the quality of Counsel's representation and put the matter before this Court to decide, Counsel repeatedly—and against the direction of the Court—disparaged his client's mental condition.

A stayed foreclosure sale and a confirmed plan are not the only metrics by which the Court assesses an attorney's performance and whether the result of this case will be good for Debtor is

---

[14] Counsel filed a motion to withdraw as Debtor's attorney on November 28, 2023, only after *Debtor* requested that he no longer be represented by Counsel. *See* Doc. 49, ¶ 1, Exhibit A. Even then, Counsel failed to follow the Court's procedures for consensual withdrawal. *See* BLR 9010-5. The Court granted the motion at the Show Cause Hearing (Doc. 53).

yet to be determined.

### f. Counsel's statements at the Show Cause Hearing are sanctionable.

Apparently feeling personally attacked at the Show Cause Hearing,[15] Counsel repeatedly disparaged Debtor's mental health stating that Debtor "is a very troubled man." Trans. 81:7-8. Notwithstanding the Court's attempt to keep Counsel on track,[16] Counsel doubled down, alleging that Debtor admitted he hears voices.[17] As the Court attempted to question Counsel about the down payment he required from Debtor before filing this case, Counsel interrupted the Court to explain that he was unable to reason with Debtor in part because Debtor "says he hears voices." Trans. 84:25-85:11. Counsel also stated that he believed his firm did an "outstanding job in this case, other than we're dealing with a client that hears voices and has no—has points where he's out of touch with reality." Trans. 90:24-91:2. Once under oath,[18] Counsel again described Debtor as "out of touch with reality," and ascribed the fee dispute to Debtor's mental status. Trans. 93:18.

On cross examination, Debtor, proceeding *pro se*, began to question Counsel about the specifics of his allegations of hearing voices (which Counsel again affirmed), but the Court stopped Debtor because the questioning was not relevant to the proceedings. 95:17-96:5. The Court also instructed Counsel to cease expounding on Debtor's mental status. Trans. 96:11-13. When Debtor questioned Counsel about his prior testimony,[19] Counsel denied the testimony and—once again

---

[15] "Mr. DaCosta really has pulled off the gloves and said some nasty allegations about me, so let me inform Your Honor more about Mr. DaCosta." Trans. 81:5-7.

[16] "I don't need to hear about Mr. DaCosta. . . I need to hear about what your fee agreement was with your client, how that was documented, what you explained to him, what happened with the money he gave you, whether you returned his phone calls, and how you went about representing him." Trans. 81:9-14.

[17] "[W]hen a client sits in your office across the table from you and says they hear voices, it's relevant for Your Honor to understand in understanding the frustrations that I had and my staff had representing this gentleman." Trans. 81:16-20.

[18] The Georgia Rules of Professional Conduct apply even when an attorney is testifying, under oath, in a dispute with his client.

[19] Debtor perhaps misremembered or misheard Counsel's prior testimony that "[Debtor is] writing [Counsel and staff]

disregarding the Court's warnings not to continue addressing Debtor's mental status—added "[m]aybe that's one of the things you hear in your head." Trans. 108:21-109:2. After a final admonishment from the Court, Counsel did not speak of Debtor's mental status on the record again.

While the content of Counsel's comments regarding Debtor's mental state are included here and in the Transcript, it is impossible to convey in writing the inappropriateness of their tone and volume. Counsel was belligerent—unnecessarily attacking Debtor's character and sanity. Debtor maintained his composure throughout these attacks and stated: "I never heard voices. I don't hear voices. I'm not an insane person." Trans. 115:13-15.[20]

Debtor's mental health status is irrelevant to whether Counsel earned his fees in this case.[21] In disclosing this information on the public record at the Show Cause Hearing, Counsel blatantly defied Professional Rule 1.6.[22]

---

letters that he's not happy with us." Trans. 107:18-19.

[20] The Court assumes *only for purposes of this Order* that Counsel's statements were true and Counsel did not perjure himself at the Show Cause Hearing.

[21] And even if Debtor's mental health were relevant, Counsel should know that presenting only hearsay testimony is generally inadequate to prove the matter and would only serve here to embarrass and demean Debtor.

[22] Rule 1.6 provides:

(a) A lawyer shall maintain in confidence all information gained in the professional relationship with a client, including information which the client has requested to be held inviolate or the disclosure of which would be embarrassing or would likely be detrimental to the client, unless the client gives informed consent, except for disclosures that are impliedly authorized in order to carry out the representation, or are required by these rules or other law, or by order of the court.

(b)

  (1) A lawyer may reveal information covered by paragraph (a) which the lawyer reasonably believes necessary:

    (i) to avoid or prevent harm or substantial financial loss to another as a result of client criminal conduct or third party criminal conduct clearly in violation of the law;

    (ii) to prevent serious injury or death not otherwise covered by subparagraph (i) above;

    (iii) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client;

The Georgia Rules of Professional Conduct provide that a "lawyer may respond to the extent the lawyer reasonably believes necessary to establish a defense," when a legal claim "alleges . . . misconduct of the lawyer involving representation of the client." Rule 1.6, Comment 16. In defending himself, however, any disclosure of Debtor's confidential information "**should be no greater than the lawyer reasonably believes is necessary to vindicate innocence, . . . should be made in a manner which limits access to the information to the tribunal or other persons having a need to know it, and appropriate protective orders or other arrangements should be sought by the lawyer to the fullest extent practicable.**" *Id*. (emphasis added). Rather than observing those safeguards or even forewarning the Court that Debtor's mental state was at issue, Counsel repeatedly asserted sensitive and irrelevant allegations regarding Debtor's mental health on the record in open court. Counsel could have defended his fees by simply presenting evidence related to his fee agreement, communications with Debtor (redacted as appropriate), and actions in representing Debtor as the Court requested. Despite the Court's numerous warnings, Counsel could not be dissuaded from continuing his ill-considered attempt to place all blame on Debtor's mental health.[23]

---

        (iv) to secure legal advice about the lawyer's compliance with these rules;

        (v) to detect and resolve conflicts of interest arising from the lawyer's change of employment or changes in the composition or ownership or a firm, but only if the revealed information would not compromise the attorney-client privilege or otherwise prejudice the client.

    (2) In a situation described in paragraph (b) (1), if the client has acted at the time the lawyer learns of the threat of harm or loss to a victim, use or disclosure is permissible only if the harm or loss has not yet occurred.

    (3) Before using or disclosing information pursuant to paragraph (b) (1) (i) or (ii), if feasible, the lawyer must make a good faith effort to persuade the client either not to act or, if the client has already acted, to warn the victim.

(c) The duty of confidentiality shall continue after the client-lawyer relationship has terminated.

[23] Were Debtor's mental health—or even his obstreperousness—to have prevented Counsel from properly representing his client, the appropriate thing to do would have been to move to withdraw from the case.

### III. CONCLUSION

In failing to reasonably communicate with his client throughout the case, failing to adequately represent his client with respect to the Truman Claim, and based on his behavior during the Show Cause Hearing, Counsel has violated numerous professionalism rules promulgated by this Court and the State Bar of Georgia. As a result, the Court concludes that the disgorgement of the entirety of Counsel's fee in this case, $5,200, is appropriate and Counsel shall additionally be sanctioned in an amount equal to $2,500. Further, the Court intends to provide a copy of this Order to the State Bar of Georgia. Accordingly, it is

**ORDERED** that Stanley J. Kakol, Jr. shall within fourteen (14) days pay sanctions in the amount of $7,700 (the "Sanctions") in **certified funds** by delivering such funds to Debtor at 565 Peachtree Street NE, Apt. 907, Atlanta, Georgia 30308, via overnight delivery with tracking information (UPS, FedEx, or USPS) or by courier; and it is further

**ORDERED** that, upon payment of the Sanctions, Counsel shall file an affidavit in this case confirming such payment.

**END OF DOCUMENT**

**Distribution List**

David George DaCosta
565 Peachtree Street NE
Apt 907
Atlanta, GA 30308

Stanley J. Kakol, Jr.
The Law Offices of Stanley J. Kakol, Jr.
5353 Fairington Road
Suite C
Lithonia, GA 30038

Lisa F. Caplan
Rubin Lublin, LLC
3145 Avalon Ridge Place, Suite 100
Peachtree Corners, GA 30071

K. Edward Safir
Standing Chapter 13 Trustee
Suite 1600
285 Peachtree Center Ave. NE
Atlanta, GA 30303

Jonathan S. Adams
Office of the United States Trustee
362 Richard B Russell Federal Building
75 Ted Turner Drive, SW
Atlanta, GA 30303